# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MARY SLOTTKE-BALISTRIERI,**

    **Plaintiff,**

    **v.**                                   **Case No. 12-CV-1046**

**TALGO, INC.,**

    **Defendant.**

---

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

Mary Slottke-Balistrieri ("Slottke") brings this lawsuit against her former employer, Talgo, Inc. ("Talgo"), alleging that she was wrongfully discharged under the public policy exception to the employment at-will doctrine. Talgo has moved for summary judgment, arguing that Slottke has not shown her discharge violated public policy and, additionally, that she cannot show she was constructively discharged. For the reasons I will explain here, Talgo's motion for summary judgment will be denied.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary

judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc.,Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## FACTS

Plaintiff Mary Slottke-Balistrieri is an adult residing in Milwaukee, Wisconsin. (Defendant's Proposed Findings of Fact ("DPFOF") at ¶ 2.) The defendant, Talgo, Inc., is a foreign corporation and a citizen of the State of Washington, with its principal place of business located in Seattle, Washington. (DPFOF at ¶ 3.)

*Talgo and the Milwaukee Facility*

Talgo designs, manufactures, and maintains high-speed passenger train car sets. (DPFOF at ¶ 4.) Its U.S. headquarters are located in Seattle, Washington, as is its main maintenance facility. (DPFOF at ¶ 5.) Talgo's Spanish parent corporation, Patentes Talgo

S.L. ("PTSL"), is headquartered in Madrid, Spain, and it has maintenance facilities across Spain. (DPFOF at ¶ 6.) In 2009, Talgo was contracted by the State of Wisconsin to build two Series 8 trains for use on Amtrak's Milwaukee to Chicago Hiawatha line. (DPFOF at ¶ 7.) The train sets would have been lighter in weight than the existing sets, resulting in fuel cost savings, and would have offered several improvements, such as WiFi, a café car, ADA-compliant lavatories, and bike racks. (DPFOF at ¶ 8.) As a result of the contract, Talgo leased and retrofitted a 300,000 square-foot building in Milwaukee to build the two train sets. (DPFOF at ¶ 9.) At that time, Talgo was also planning to manufacture two additional train sets for a proposed high-speed rail line between Milwaukee and Madison, as well as two train sets for the State of Oregon at the Milwaukee facility. (DPFOF at ¶ 10.) Talgo was planning to maintain a small operation in Milwaukee following the completion of the train sets in order to staff its 20-year maintenance contract with the State of Wisconsin. (DPFOF at ¶ 11.)

Talgo brought in employees from its U.S. and Spanish headquarters to lead the manufacturing process (DPFOF at ¶ 13), and it hired over 60 Milwaukee-based employees (DPFOF at ¶ 12). The Spanish employees' command of the English language was poor, which resulted in frequent miscommunications. (DPFOF at ¶ 14.) Talgo's Milwaukee facility opened in September 2010, and the first car shells arrived in November 2010. (DPFOF at ¶ 15.) The aluminum car shells were built at PTSL's Madrid manufacturing facility and transported to the United States via ship and truck. (DPFOF at ¶ 16.)

*Slottke's Employment with Talgo*

Slottke started her employment at Talgo in October 2010. (DPFOF at ¶ 17; Plaintiff's Proposed Findings of Fact ("PPFOF") at ¶ 4.) She was hired as Talgo's Quality and Safety

Technician/Specialist. (DPFOF at ¶ 18; PPFOF at ¶ 4.) Her main responsibility was for safety for the entire plant (PPFOF at ¶ 4), and she was tasked with implementing an ISO 9001[1] compliant quality system at the Milwaukee facility (DPFOF at ¶ 18; PPFOF at ¶ 3). Slottke was to oversee the day-to-day operations of the system (PPFOF at ¶ 3), and she held responsibility for both drafting the policies and procedures and making sure the company followed them (PPFOF at ¶ 5). Talgo appointed Slottke as its management representative sometime in January 2011 (DPFOF at ¶ 19), and she had a large scope and volume of policies and procedures to put into place and follow in order to meet ISO standards. (PPFOF at ¶ 6.) She developed and implemented several ISO compliant quality standards. (PPFOF at ¶ 13.) The goal of ISO is to assure compliance with one standard procedure and to be transparent in quality management. (PPFOF at ¶ 8.) Slottke was also responsible for coordinating internal quality auditing (DPFOF at ¶ 20) and scheduling auditors and employees from Washington State and Spain to come perform internal audits (PPFOF at ¶ 7). She was also told that she would be in charge of preparing and turning over a dossier containing all inspection records, test results, and records, before that train could be delivered to the State. (PPFOF at ¶ 71.)

Slottke reported directly to Quality Lead Andres Morcillo ("Morcillo"), a PTSL employee brought to Milwaukee from Spain, to lead the Quality Management System ("QMS") implementation, among other things. (DPFOF at ¶ 21.) Morcillo had a poor command of English. (DPFOF at ¶ 22.) Gloria Lupo ("Lupo") and Steve Bembenek ("Bembenek"), both quality technicians, were also part of the Milwaukee quality team.

---

[1] ISO, or International Standard Organization, develops voluntary international standards (DPFOF at ¶ 31), and among them is ISO 9001:2008, which helps companies develop a quality management system (DPFOF at ¶ 32).

(DPFOF at ¶ 23.) Jeff Hart ("Hart"), Special Projects Manager, who worked at Talgo's Seattle headquarters, was the corporate representative of the quality team. (DPFOF at ¶ 24.) His role was to support implementation of the QMS systems in Milwaukee in advance of the ISO certification. (DPFOF at ¶ 25.) Hart was a resource to Slottke, and he was available to address any questions or concerns she had relating to QMS processes or procedures. (DPFOF at ¶ 26.)

*The ISO 9001:2008*

Talgo's contract with the State of Oregon specified that Talgo must implement the ISO 9000 system. (PPFOF at ¶ 10; DPFOF at ¶ 28.) ISO, or International Organization for Standardization, is the world's largest developer of voluntary International Standards. (DPFOF at ¶ 31), and among them is ISO 9001:2008, which helps companies develop a quality management system (DPFOF at ¶ 32). Its contract with the State of Wisconsin required Talgo to provide the State with a "description of the quality control system in effect in [Talgo's] workshop and which is in force in connection when dealing with subcontractors." (DPFOF at ¶ 29.) Talgo opted to also use the ISO system in its Milwaukee facility to fulfill the requirements of the contract. (PPFOF at ¶ 11; DPFOF at ¶ 28.) The parties dispute whether the Wisconsin contract requires compliance with ISO 9001:2008 or that Talgo have its Milwaukee facility registered. (DPFOF at ¶ 30; Pl.'s Response to DPFOF, Docket # 36 at ¶ 30.) However, I find that, on its face, the contract is clear that it does not require the implementation of the ISO 9001 system; though it does require the implementation of some quality control system. (Wisconsin Contract, Docket # 31-1 at 41-42, Article 44.) The plaintiff also contends that non-compliance with the ISO system would have jeopardized both the Oregon and Wisconsin contracts (PPFOF at ¶ 10), but the

defendant denies that failing to follow an ISO 9000 system would have jeopardized the Wisconsin contract (Def.'s Response to PPFOF, Docket # 38 at ¶ 10).

ISO requires a procedure or system be adopted by the company for inventory management (PPFOF at ¶ 16; DPFOF at ¶ 35), but it does not require that a specific inventory system be used (DPFOF at ¶ 36). The parties agree that Talgo adopted the SAP system to manage inventory. (PPFOF at ¶ 14, 16.) Slottke states that the quality team selected SAP as the sole tracking system for parts and materials at the Milwaukee facility. (PPFOF at ¶ 17) Talgo states that it used a spreadsheet in addition to the SAP system to track inventory. (Def.'s Response to PPFOF, Docket # 38 at ¶ 16.) Talgo states that the spreadsheet was available on a common drive located on the Talgo computer network. (DPFOF at ¶ 71.) However, Slottke contends she had not seen the spreadsheet until the present lawsuit. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 71.) The plaintiff and defendant agree that some parts and materials were tracked on an Excel spreadsheet (PPFOF at ¶ 18), but the parties dispute whether this practice was an accepted and adopted separate tracking system (PPFOF at ¶ 21). Talgo admits that only the parts from Spain that were supposed to be installed on train cars in Spain were tracked in the Excel spreadsheet. (Def.'s Response to PPFOF, Docket # 38 at ¶ 19; *see also* PPFOF at ¶ 19.) Slottke states that she first discovered that the parts were being tracked outside of the SAP system through her own internal auditing. (PPFOF at ¶ 20.) She also states that neither she nor the quality team "accepted or adopted a separate [E]xcel spreadsheet tracking system, and they had no reason to because the Defendant spent significant money to implement the SAP system." (PPFOF at ¶ 21.) Talgo states that ISO allows a company to use a system, such SAP, to track inventory as well as a separate spreadsheet, and Slottke counters that such a statement

is irrelevant as the quality team charged with establishing a tracking system never authorized the use of a separate spreadsheet. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 38.)

*Manufacturing Delay and Receipt of "Free Issue" or "Black Market" Parts*

Talgo manufactured the aluminum car shells for the Hiawatha rail at PTSL in Spain. (DPFOF at ¶ 42.) PTSL's standard manufacturing process in Spain is to move train shells from one work station to another upon completion of the tasks specified for that station. (DPFOF at ¶ 55.) In order to avoid a stop in production when parts necessary to complete those tasks arrive late, PTSL either move the shell to the next station without closing the work order or closes the work order and records on a spreadsheet outside of SAP all materials and tasks that remain to be incorporated. (DPFOF at ¶ 56.) Materials are then installed as they are received. (DPFOF at ¶ 56.) Talgo's Milwaukee facility adopted this production process as well. (DPFOF at ¶ 53.)

When the train car sets were shipped from Spain, certain parts that were supposed to be installed there were not installed prior to the shipping date due to a manufacturing delay.[2] (DPFOF at ¶ 43.) PTSL opted to ship the incomplete car shells to Milwaukee, along with the uninstalled parts, rather than miss the shipping date.[3] (DPFOF at ¶ 44.) The parts shipped with the cars included brackets, screws, washers, and the like, and they were

---

[2] The plaintiff argues that the material supporting this proposed fact is hearsay, but it would be allowed under the business records exception to the hearsay rule as it is supported by a memo drafted by Christopher Crist regarding "black market parts." (*See* Internal Communication Memo, Exh. C to Aff. of Christopher Crist, Docket # 32-3.)

[3] The plaintiff argues that the material supporting this proposed fact is also hearsay. Again, however, it would be allowed under the business records exception to the hearsay rule as it is supported by a memo drafted by Christopher Crist regarding "black market parts." (*See* Internal Communication Memo, Exh. C to Aff. of Christopher Crist, Docket # 32-3.)

installed at the Milwaukee facility.[4] (DPFOF at ¶ 45.) The defendant's position is that none of the parts were modified—that they were sent from Spain and installed on the car as-is. (DPFOF at ¶ 46.) Slottke's position, however, is that during a management review meeting, Messrs. Paloma and Morcillo explained that they received nonconforming car shells that were not the correct size and that they were getting "black market" parts from Spain. (PPFOF at ¶ 51.) Slottke's understanding, and her proposed finding of fact, is that the car shells were not the correct dimensions, which meant they were noncompliant with the original drawings and they were trying to finish the cars with other parts that were not part of the original plan or specification. (PPFOF at ¶ 52.) The defendant denies this, and says that Slottke never saw documentation saying that the car shells were the incorrect dimensions. (Def.'s Response to PPFOF, Docket # 38 at ¶ 52.) However, in her deposition, Slottke testified that she had seen such documentation. (Slottke Dep., Docket # 34-3 at 17:21-18:4.) Slottke also proposes that she saw documentation showing the nonconforming parts coming in from Spain that had different dimensions from what was called for in the blueprints. (PPFOF at ¶ 54.) The defendant admits that she testified as such but denies that the free issue parts had dimensions different from those called for in the blueprints. (Def.'s Response to PPFOF, Docket # 38 at ¶ 54.) She also states that she heard Messrs. Palomo and Morcillo communicate the plan to Talgo's president and CFO, so she believed the plan to be true. (PPFOF at ¶ 53.) The defendant denies this proposed fact. (Def.'s Response to PPFOF, Docket # 38 at ¶ 53.)

---

[4] The plaintiff argues that the material supporting this proposed fact is also hearsay. However, at his deposition, Crist stated he saw a person installing the parts. Therefore, he made this statement based on personal observation, and it would therefore not be hearsay. (*See* Crist. Dep, Docket # 28-4 at 45:25-46:1.) Alternatively, the information is also in the internal memo about "black market parts" and could be admitted under the business records exception to the hearsay rule. (*See* Internal Communication Memo, Exh. C to Aff. of Christopher Crist, Docket # 32-3.)

Hart first heard about these parts from Slottke. (PPFOF at ¶ 44.) He also heard about Talgo's management telling employees to falsify inspection records. (PPFOF at ¶ 45.) Gary Young ("Young"), shop floor manager, first heard the term "black market parts" when Javier, the facility manager, used that term during a management meeting. (PPFOF at ¶ 46.) CFO George Hlebechuk ("Hlebechuck") heard it for the first time in an ISO meeting, at which Slottke was present. (PPFOF at ¶ 47.)

The parties agree that Slottke was not aware that the parts should have been installed in Spain but were shipped separately due to a timing issue. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 57.) She understood that the only parts being installed in Milwaukee were parts from U.S. and European vendors. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 58.)

Talgo recorded the "free issue" parts at zero cost, then charged the labor back to PTSL. (DPFOF at ¶ 47.) It is Talgo's position that the free issue parts were inspected upon receipt in Spain pursuant to PTSL's ISO procedures before being shipped to Milwaukee. (DPFOF at ¶ 48.) The plaintiff contends that Lupo, who was the quality employee in charge of receiving the parts, did not see any documentation saying the parts had been inspected in Spain. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 48.) Thus, Talgo states that all non-conformances were identified, tracked, and corrected in Spain. (DPFOF at ¶ 49.) Slottke disputes this, citing Lupo's deposition testimony that she issued some reports and found bad Spanish parts despite Morcillo's instruction not to do so, establishing that there were non-conformances that had not been identified, tracked, and corrected in Spain. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 49.) Further, it is Talgo's position that because the inspection process occurred in Spain, additional inspection was not needed when the parts were received in Milwaukee. (DPFOF at ¶ 50.)

The parties do not dispute that at least some of the Spanish parts were tracked outside of the SAP system. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 51.) Talgo's position is that these parts were also stored in an area separate from all other parts.[5] (DPFOF at ¶ 52.) Talgo also states that all other parts received from PTSL, as well as parts from outside vendors, were entered into SAP. (DPFOF at ¶ 53.) However, I find the plaintiff's objection—that the cited authority does not support the finding of fact—to have merit. The quoted affidavit, and the deposition cited in the defendant's reply to the plaintiff's responses to its proposed findings of fact, do not support the proposed fact in Paragraph 53. It is also Talgo's position that it made no effort nor had any intent to conceal these parts from anyone, including ISO auditors. (DPFOF at ¶ 70.) Slottke disputes this, relying on her complaint and her deposition testimony, where she testified that Javier and Andres told them they were missing parts on shells and would be getting "black market" parts, which she understood to mean they were trying to finish the cars with parts not part of the original plans. (Pl.'s Response to DPFOF at ¶ 70.) The defendant's reply that Morcillo never made the statements attributed to him, citing various affidavits and deposition transcripts. (Def.'s Reply to Pl.'s Response to DPFOF, Docket # 39 at ¶ 70.)

Between July 27-29, 2011, ISO auditors performed an ISO registration audit at Talgo's Milwaukee facility. (DPFOF at ¶ 39.) The final report issued no non-conformances. (DPFOF at ¶ 40.) The auditor recommended unconditional approval of Talgo's registration, finding that Talgo "was able to demonstrate the capability to implement and maintain an

---

[5] The plaintiff objects to the Defendant's Proposed Finding of Fact number 52, stating that the support cited is hearsay. The defendant supports this proposed finding of fact with deposition testimony from Gary Young. In his deposition, Young testifies that he personally observed that the parts were in a separate location. (*See* Young Dep., Docket # 28-2 at 31:6-11;33:7-11;41:20-25.)

effective system to meet the organization's objectives, in compliance with the quality system requirements."[6] (DPFOF at ¶ 41.)

Sometime in 2011, Slottke approached Crist about train parts being referenced on the shop floor as "black market" parts after she learned, through an internal audit, that parts from Spain were being tracked outside of SAP. (DPFOF at ¶ 59.) Slottke indicated that these parts were not being inspected and that non-conformance reports were not being issued for them. (DPFOF at ¶ 60.) It is the defendant's position that during this conversation, Slottke did not mention to Crist that there was anything wrong with the process being used. (Def.'s Reply to Pl.'s Response to DPFOF, Docket # 39 at ¶ 61.) The plaintiff explains that Slottke did complain to Crist about the procedures—by email and in person. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 61 (citing Docket # 34-10, ¶¶ 19-20; Docket # 28-4 at 36:16-19).) Besides her concern about inspection and documentation, Slottke raised no other concerns about the parts being tracked outside of SAP.[7] (DPFOF at ¶ 62.) At her deposition, Slottke testified that Morcillo sent her an email directing her to conceal the parts being tracked outsides of SAP.[8] (DPFOF at ¶ 63.) Crist and Hlebechuck investigated the "black market" part matter and learned that the term "black market" was used by Spanish employees in reference to the free-market parts. (DPFOF at ¶ 65.) Crist

---

[6] The plaintiff objects to the Defendant's Proposed Findings of Fact numbered 39 through 41, stating that they are not relevant as they relay information about events that occurred after Slottke was no longer employed there. (Pl.'s Response to DPFOF, Docket # 32 at ¶¶ 39-41.) Talgo counters that the information is relevant because Slottke alleges that she was forced to quit due to Talgo's noncompliance with ISO standards. I agree that the facts are relevant.

[7] In responding to the defendant's proposed finding of fact, the plaintiff cites various portions of Crist's deposition in which Crist testifies about various topics he discussed with Slottke. The quoted portions of the deposition do not refute the proposed fact in Paragraph 62, however. (*See* Pl.'s Response to DPFOF, Docket # 32 at ¶ 62.)

[8] Neither party has located this email. (DPFOF at ¶ 64.) The plaintiff argues that this is irrelevant. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 64.) I find that it is relevant, though it would be much more relevant at trial.

considered the matter closed as he was assured that the term "black market" was a colloquial expression used by Spanish employees to reference parts tracked outside of SAP and not some illegal enterprise. (DPFOF at ¶ 67.) It is the defendant's position that Slottke did not follow up with Crist about the parts being tracked outside of SAP until this lawsuit. (DPFOF at ¶ 68.) The plaintiff states that she spoke to Crist about the black market parts on several occasions, including just prior to her resignation (Pl.'s Response to DPFOF, Docket # 32 at ¶ 68). The defendant states that Slottke did not raise the issue of parts being tracked outside of SAP with Hart, who was directly involved in implementing the QMS procedures. (DPFOF at ¶ 69.) The plaintiff counters that she did speak to Hart about black market parts. (Pl.'s Response to PPFOF, Docket # 32 at ¶ 69.) Though the defendant responds that the deposition testimony Slottke cites does not reference black market parts being tracked outside of SAP, a review of the deposition shows Hart is not sure what the conversation he had with Slottke was about, though it does appear he may have learned about the Excel spreadsheet after their conversation. (Hart Dep., Docket # 34-6 at 23:7-25:5.) In short, the nature and content of the conversation between Slottke and Hart is not clear. It is also Talgo's position that the spreadsheet was not designed to conceal parts from auditors. (DPFOF at ¶ 72.) Slottke disputes this, explaining that it is her position that she understood that the car shells were not the correct dimensions and that nonconforming parts would therefore be used on the cars. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 72 (citing PPFOF at ¶¶ 51-54).) Young, the shop floor manager, personally walked the floor with state auditors and showed them the parts that were tracked outside of SAP. (DPFOF at ¶ 73.) Further, internal audit results listed the separate spreadsheet tracking system as an improvement action item. (DPFOF at ¶ 74.)

*Quality Forms and the QMS Processes*

Talgo used written processes and forms from both Seattle and Spain, which were translated and revised as necessary, in the Milwaukee facility. (DPFOF at ¶ 75.) This took place throughout the entire implementation period as holes in the process and areas of improvement were identified. (DPFOF at ¶ 76.) Talgo's Inspection Process and Receipt Test procedures required Material Inspection Reports ("MIRs") to be created when there are discrepancies in the inspection or verification of the product. (DPFOF at ¶ 77.) The MIR form is used to track non-conformances. (DPFOF at ¶ 78.) Previously, Talgo used a form called a "Non-Conformance Report" ("NCR") to track such non-conformances. (DPFOF at ¶ 79; *see also* PPFOF at 9.) Talgo states that at some point during the QMS creation and implementation process, it discovered that it should have been using the MIR instead of the NCR. (DPFOF at ¶ 80.) Slottke states that Morcillo unilaterally implemented the new forms, and she states that she was in charge of QMS creation and implementation and never made any such discovery, decision, or conclusion. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 80.) Gary Young, the shop manager, who had ISO 9000 internal auditor training, oversaw the Milwaukee facility's day-to-day operations and he reported to Antonio Perez, the CEO. (PPFOF at ¶ 1.) It was and is his understanding that there are two types of NCRs: those that went to PTSL in Spain, which went through Andres Morcillo, and the customer/vendor/supplier NCR. (PPFOF at ¶ 22.) According to Slottke, the quality team, however, never approved an NCR process that sent NCRs through Morcillo because it was important to maintain some separation between quality and management. (PPFOF at ¶ 23.) On at least two occasions, Morcillo asked the quality team to send him NCRs for his signature and approval (PPFOF at ¶ 24; *see also* Exh. J to McLeod Aff., Docket # 34-12),

13

though Slottke averred this occurred "several times" (PPFOF at ¶ 24; Slottke Aff., Docket # 34-1 at ¶ 12). It is Talgo's position that Slottke's allegation that she was asked to participate in a scheme to falsify documents arises from her not being informed of the change in forms prior to it occurring. (DPFOF at ¶ 81.) Slottke disputes this. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 81.)

Slottke and the quality department were charged with inspecting incoming material. (PPFOF at ¶ 26.) Each morning, Gloria Lupo ("Lupo") printed out a report generated by SAP, and the parts on that list were the parts she inspected. (PPFOF at ¶ 27.) If the parts were not on that list, she would not have known they were in the building. (PPFOF at ¶ 27.) Slottke's position is Lupo informed her that Palomo and Morcillo instructed Lupo not to issue noncomformance reports on parts that came from Spain (PPFOF at ¶ 28), though the defendant denies this (Def.'s Response to PPFOF, Docket # 38 at ¶ 28). A first article of inspection ("FAI") is completed during a manufacturing process when a manufacturer conducts a first run of a part and an inspection is performed on that part to be sure it performs as intended before a bulk production is completed. (PPFOF at ¶ 29.) Lupo testified that she never saw an FAI from Spain saying any Spanish parts were inspected. (PPFOF at ¶ 30; Lupo Dep., Docket 34-8 at 15:4-8.) It is Slottke's position that all parts and materials arriving at Talgo, even those with FAI forms, were not exempt from SAP tracking and Talgo's inspection and NCR procedures. (PPFOF at ¶ 31.) The defendant's deny this, citing Hart's testimony, in which he states that there are "many, many items that come in that, for whatever reason, do not require inspection or some type of certificate or whatever may be . . . ." (Def.'s Response to PPFOF, Docket # 38 at ¶ 31; Hart Dep., Docket # 34-6 at 21:18-21.) During incoming inspection of materials, materials found to be defective were to have a

14

material inspection report filled out as a way to document the defect and get the corrective action taken to remedy the situation. (PPFOF at ¶ 41.) It is Slottke's position that when a part came to Talgo in Milwaukee through PTSL in Spain, PTSL should have received an NCR rather than the manufacturer of the part, and NCRs should have been sent to PTSL in Spain. (PPFOF at ¶ 42.) Talgo agrees with this to the extent it refers to parts procured or purchased for installation in Milwaukee. (Def.'s Response to PPFOF, Docket # 38 at ¶ 42.) It is Slottke's position that there was no exceptions to issuing NCRs when nonconforming parts came in from Spain (PPFOF at ¶ 43), but the defendant's position is that NCRs were not issued for parts that did not require inspection in Milwaukee. (Def.'s Response to PPFOF, Docket # 38 at ¶ 43.)

Lupo testified that she argued with management about the instruction not to issue noncomformance reports and wrote some anyway because she believed it was her job to do so and because she believed the practice of fixing parts instead of replacing them or returning them to suppliers was contrary to usual company policy and her personal belief about what was correct. (PPFOF at p 32; Lupo Dep., Docket # 34-8 at 17:19-24; Lupo Aff., Docket # 34-9 at ¶ 14.) Lupo told Slottke that she disagreed with the direction not to write the NCRs because she believed there should be records for nonconforming parts. (PPFOF at ¶ 33.)

The parties agree that Slottke was never asked or directed to falsify forms (DPFOF at ¶ 82), though it is Slottke's position that she received an "implicit direction" to falsify forms (Pl.'s Response to DPFOF, Docket # 32 at ¶ 82). Slottke testified at her deposition that sometime in June 2011, she observed two quality employees filling out the MIR, a form with which she was unfamiliar. (DPFOF at ¶ 83.) Slottke took one of the forms and noted

that it was for a part inspected on an earlier date. (DPFOF at ¶ 84.) She testified that the forms were signed, backdated, and included information that they did not know to be accurate. (DPFOF at ¶ 85.) She then brought the MIR form to Crist and voiced her concerns, "expect[ing] that it would be taken care of." (DPFOF at ¶ 86.) Crist looked into the matter and learned that the MIR form had replaced the NCR form and that the information was being transferred from the incorrect form to the correct form. (DPFOF at ¶ 87.) Talgo's position is that Crist concluded, based on his investigation, that no documents were being falsified. (DPFOF at ¶ 88.) Slottke cites to her proposed finding of facts regarding Lupo's affidavit and deposition testimony about forms she filled out regarding torqueing and inspection, arguing that Crist could not and would not have concluded there was no falsification had he actually conducted an investigation. (Pl.'s Response to DPFOF at ¶ 88.) It is not clear from reviewing the proposed findings of fact cited by the plaintiff, numbers 34 to 40, whether Lupo was talking about MIR forms or some other form, as the defendant suggests. (*See* Def.'s Response to PPFOF, Docket # 38 at ¶ 34.) Talgo's position is that Lupo and Steve Bembenek ("Bembenek") have confirmed that they were never directed to backdate or falsify information on MIRs. First, I note that the defendant did not provide any evidence that Bembenek has confirmed this, so I will consider only Lupo. The portion of the deposition cited to support the proposed fact is as follows:

> Q: Okay. During her deposition, Ms. Slottke testified that she saw your backdating Exhibit No. 2, the material inspection report. Do you have any recollection of that ever occurring?
>
> A: No.

This cited portion of Lupo's deposition does not support the proposition that Lupo was never directed to backdate or falsify information on MIRs. It merely supports that she did

not backdate that particular exhibit (though it is not clear what that exhibit was). The plaintiff then counters, citing Lupo's affidavit, in which she avers that she was asked to fill in inspection forms even where information was not known and to falsify data and dates. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 89.) Though Lupo did agree that she did not make information about torqueing in her deposition, as the defendant cites in its reply to its proposed finding of fact (*see* Def.'s Reply to Pl.'s Response to DPFOF, Docket # 39 at ¶ 89), that testimony is not dispositive of the issue either as that form is separate from the MIR form (*see* DPFOF at ¶ 91).[9] Therefore, this fact—whether Lupo was directed to backdate or falsify MIRs—is disputed.

At some point, Talgo began the process of torqueing certain parts, such as bolts, on the train sets. (DPFOF at ¶ 90.) The required torque setting for each bolt was listed on a management form called a "production order." (DPFOF at ¶ 91.) Each bolt's torque measurement needed to conform with the measurement listed on the production order, and a paint mark was to be placed on the bolt allowing maintenance personnel to easily see whether the bolt was properly torqued at a future by checking to see whether the paint mark properly aligned with the bolt.[10] (DPFOF at ¶ 92.) When Talgo began the torqueing process, there was no quality form on which to track wrench ID numbers. (DPFOF at ¶ 93.) Sometime after Talgo began to the process of torqueing train parts, quality introduced a new form capturing the wrench ID numbers (the "Wrench ID Form"). (DPFOF at ¶ 94.) The Wrench ID Form captured the wrench ID number, the PSI or gauge results from that

---

[9] The defendant also cites to other portions of Lupo's deposition. However, those portions of the deposition are not among the materials submitted by either party.

[10] The plaintiff objected to this proposed fact, arguing that the support cited was hearsay. The fact as proposed began with "Ms. Lupo would confirm," which is not essential to the fact. Further, the cited support—Hart's affidavit—is not hearsay.

wrench, the torquer's initials, and the date. (DPFOF at ¶ 95.) After the Wrench ID Form was implemented, Lupo and Bembenek were instructed by Morcillo to complete the Wrench ID Forms for the completed torque tests. (DPFOF at ¶ 96.) It is Talgo's position that Hart told Lupo and Bembenek that if there were inspections indicated on the production order that had not been completed, they should perform that inspection to ensure that it was properly documented. (DPFOF at ¶ 97.) The plaintiff disputes this, citing to Lupo's affidavit and her proposed facts numbered 34 through 40. This authority does not create a factual dispute as Lupo's averments about being asked to falsify documents does not preclude or contradict Hart instructing her and Bembenek to perform inspections that had not been completed. The reason the quality documentation was not completed at the time the inspections were performed was because the forms had not yet been created. (DPFOF at ¶ 98.) At her deposition, Lupo testified that she did not think this was a "bad thing." (DPFOF at ¶ 98.) She also testified that the process of filling out the forms after the inspection was common at Talgo though she had not experienced it any other company for which she worked. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 98; PPFOF at ¶ 40.)

Talgo's proposition is that even though the Wrench ID Forms were not completed contemporaneously with the inspections, the information was not false or "made up." (DPFOF at ¶ 100.) In her deposition, Lupo testified that she agreed that she did not "make up the information that [she] put on those forms" and the information she put on the forms was "information [she] previously gathered" that had not been documented. (Lupo Dep., Docket # 34-8 at 23:23-24:5.) However, as the plaintiff points out, Lupo also testified that she made "some assumptions and some guesses" when filling in the calibration numbers (Lupo Dep., Docket # 34-8 at 38:10-15.) She also testified that at times she did not know the

information needed for backdated forms and took an "educated guess." (Lupo Dep., Docket # 34-8 at 38:5-10.) In her affidavit, she averred that her supervisors, Palomo and Morcillo, asked her to fill in dates on inspection forms to make it look like inspection tests were done, even if they were not done or the results were not known (Lupo Aff., Docket # 34-9 at ¶ 8), a proposed finding that the defendant admits (Def.'s Response to PPFOF, Docket # 38 at ¶ 35). She also testified that her understanding of the primary motivation for falsifying such data was to make it appear as though the required tests and documents had been completed for ISO (*id.* at ¶ 9; *see also* PPFOF at ¶ 39). It is Talgo's position that Lupo knew which wrenches were used on which items because she torqued those items herself. (DPFOF at ¶ 101.) The plaintiff disputes this, citing the same testimony and averments discussed above. (*See* Pl.'s Response to DPFOF, Docket # 32 at ¶ 101.) During her deposition, Lupo testified that she knew what to put on the paperwork because, "we only have a certain amount of torque wrenches, and certain ones go different pounds, uh, PSI, let's say, pounds per square inch, and there's only one or two you use, and nine out of ten times we only used one . . . . I knew which ones were used and on each item because I actually torqued it myself." (Lupo Dep., Docket # 34-8 at 23:9-18.) Talgo also takes this testimony to mean that for torqueing done by other employees, Lupo entered the wrench IDs based on her knowledge of the torqueing system, specifically that Talgo only used two wrenches and one was used 90% of the time (DPFOF at ¶ 102), though the plaintiff disputes this (Pl.'s Response to DPFOF, Docket # 32 at ¶ 102). Lupo testifies that the when filling out inspection forms, she relied upon the assumption that somebody had done the require torqueing properly because she was not always present. (PPFOF at ¶ 36.) At one point in her deposition, Slottke testified that the gauge results were "documented . . . on any original documentation." (Slottke

Dep., Docket # 34-3 at 20:18-21:24.) Talgo's quality procedures did not require that gauge results or wrench ID numbers be documented. (DPFOF at ¶ 104.)

Slottke testified that she asked Lupo and Bembenek, about certain forms they were creating because the forms were not part of the ISO system. (PPFOF at ¶ 37.) Slottke further testified that she asked Bembenek how he knew what gauge and what results to enter the MIR forms, and he answered that he did not know and just completed the forms as he was told to do. (PPFOF at ¶ 38.)

When a quality employee identifies a process or procedure that is not compliant with established processes or procedures there are several acceptable courses of action. (DPFOF at ¶ 107.) Indeed, Slottke had an obligation and/or responsibility to report any unresolved quality issues to her supervisor or management. (PPFOF at ¶ 48.) The defendant admits that if she discovered that her supervisors were requesting that employees falsify inspection reports, she would have had an obligation to report it. (Def.'s Response to PPFOF, Docket # 38 at ¶ 49.) According to Hart's deposition testimony, the first is to write a non-compliance or corrective action request on the process-related item. (DPFOF at ¶ 108; Hart Dep., Docket # 34-6 at 48:23-49:18.) He testified that the issue is therefore documented and communicated to the appropriate individuals, allowing for resolution. (DPFOF at ¶ 109; Hart Dep., Docket # 34-6 at 48:23-49:18.) Second, quality could update the current procedure to reflect the procedure actually being used. (DPFOF at ¶ 110.) Employee concerns can also be reported pursuant to the grievance procedure set forth in the employee handbook. (DPFOF at ¶ 113.) Under this procedure, employees should first report concerns to their direct manager. (DPFOF at ¶ 114.) If the complaining employee's concern involves

his or her supervisor, the matter may be elevated to the supervisor's manager, all the way to CEO Perez. (DPFOF at ¶ 114.)

Talgo's position is that Slottke never created an NCR or CAR addressing her concerns about parts from PTSL not being inspected for non-compliances and/or backdating of inspection reports. (DPFOF at ¶ 111.) Though Slottke disputes this, stating that there is no evidence that a correcting active reporting system was ever in place (*see* Pl.'s Response to DPFOF at ¶ 111), the defendant is correct that the MIR form has a place to indicate whether corrective action is needed (*see* Exh. B. to Hart Aff., Docket # 33-2). Talgo also proposes that Slottke never proposed revising current procedures to reflect the tracking system being used as she should have (DPFOF at ¶ 112), and though Slottke disputes this, her argument that she would not have done so because she understood it to be a conduit for fraud, she does not create a dispute of fact (*see* Pl.'s Response to DPFOF at ¶ 112). Slottke also never raised her concerns with CEO Perez. (DPFOF at ¶ 115.) Slottke testified that she did take a falsified form from Bembenek to Human Resource Manager Christopher Crist to tell him what was going on. (PPFOF at ¶ 50.) She informed him that Morcillo was asking employees not to issue NCRs for parts from Spain. (PPFOF at ¶ 58.) Crist also received an email from Slottke that she had concerns about her managers asking her to do something unethical, and he claims that she recommended that she talk to Talgo's CEO. (PPFOF at ¶ 59.) Slottke also complained to Crist that other employees were being asked to falsify inspection records, though the timing is not clear. (PPFOF at ¶ 61.) She told him that employees were asked to alter numbers or falsify results and showed him some doctored NCR/MIR forms. (PPFOF at ¶ 62.) It is Slottke's position that she informed Crist that the incorrect forms were used and that was improper or unethical. (PPFOF at ¶ 63.) She also

sent him an email expressing her frustration or concern about her ability to continue as a management representative for ISO. (PPFOF at ¶ 64.) She told him that she desired to change her position so she would no longer have to report to Morcillo. (PPFOF at ¶ 65.) Slottke requested that she continue at Talgo in a consultant's position. (PPFOF at ¶ 66.) Slottke performed quality audits throughout her employment. (DPFOF at ¶ 116.) Slottke never documented any non-conformances with QMS procedures relating to free issue parts or the use of the MIR forms. (DPFOF at ¶ 117.)[11]

Talgo completed a final internal audit in preparing for the ISO certification audit shortly before Slottke's resignation. (DPFOF at ¶ 118.) Sometime in or around June 2011, Talgo held a management review meeting to discuss the upcoming ISO 9000 audit. (DPFOF at ¶ 124.) Talgo's position is that no one in the management review meeting discussed concealing black market parts from auditors or directed attendees to conceal black market parts from auditors. (DPFOF at ¶ 125.) Slottke disputes this. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 125.) On July 4, 2011, Javier Palomo, the plant manager, distributed the internal audit results to a number of Talgo's employees, including Slottke. (DPFOF at ¶ 119.) The audit results include several improvement action. Item IA-18 notes that parts arriving from PTSL are not tracked in SAP but rather manually in Excel. (DPFOF at ¶ 120.) It is Talgo's position that despite her involvement in that audit, Slottke did not raise any concerns about concealment of parts, falsification of inspections records, or NCRs in response to the internal audit results. (DPFOF at ¶ 121.) Slottke cites to several instances of her reporting her concerns (*see* Pl.'s Response to DPFOF at ¶ 117), though the

---

[11] Though the plaintiff cites to numerous instances of Slottke making inquiries or complaints, none of the citations provide information that she documented her inquiries or complaints.

defendant is correct to point out there is no proof that Slottke's complaints occurred after the internal audit (Def.'s Reply to Pl.'s Response to DPFOF at ¶ 121).

Slottke resigned from her position on Saturday, July 16, 2011. (DPFOF at ¶ 122.) She was in good standing when her employment ended. (PPFOF at ¶ 67.) Crist testified that if the alleged scheme was true, and he was in Slottke's position, he may have felt forced to quit. (PPFOF at ¶ 70.) In June of 2012, Talgo laid off all but five of its Milwaukee-based employees after the State of Wisconsin cancelled its contract with Talgo. (DPFOF at ¶ 123.) Bembenek is currently employed by Talgo. (DPFOF at ¶ 126.) Lupo was laid off when the Milwaukee facility closed. (DPFOF at ¶ 127.) At her deposition, Lupo testified that she would not have stayed until the end if any of the conduct discussed at her deposition made her feel like she needed to quit. (Lupo Dep., Docket # 34-8 at 34:3-15.) In her affidavit, Lupo avers that she followed her supervisors' instruction "because I wanted to keep my job." (Lupo Aff., Docket # 34-9 at ¶ 17.)

## ANALYSIS

In her complaint, Slottke alleges Talgo engaged in a scheme to conceal non-conforming black market/free issue parts from ISO auditors and state auditors. Her allegations of fraud particularly concern the failure to track the parts shipped from Spain (the black market/free issue parts) in the SAP system; the instruction to falsify NCR/MIR forms; and the failure to issue NCR forms for the black market/free issue parts coming from Spain. Slottke alleges that she was constructively discharged for refusing to participate in Talgo's alleged fraudulent scheme. Talgo moves for summary judgment, arguing that Slottke has not establish that the discharge violated the well-defined public policy evinced by

Wis. Stat. § 943.39.   Specifically, Talgo submits that Slottke has not shown that Talgo

directed her to engage in acts prohibited by Section 943.49.

*Legal Standards*

Wisconsin law controls in this case. Wisconsin generally follows the employment at-

will doctrine, which allows an employer to terminate an at-will employer for any or no

reason and with or without cause. *Strozinsky v. School District of Brown Deer*, 2000 WI 97, ¶

33, 237 Wis. 2d 19, 38, 614 N.W 443, 453. Wisconsin has defined a very narrow exception

to the at-will doctrine: the public policy exception, as first recognized by the Wisconsin

Supreme Court in *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834 (Wis.

1983). The public policy exception allows at-will employees in very limited circumstances to

bring suit against employers who terminated their employment in violation of a public

policy. The exception is "narrow" and "balances the need to protect employees from

terminations that contradict public policy with the employer's historical discretion to

discharge employees under the freedom to contract embodied in the at-will doctrine."

*Strozinksy*, 2000 WI 97, ¶ 36, 237 Wis. 2d at 40, 614 N.W.2d at 453.

The plaintiff must satisfy a two-part test to prevail under the narrow public policy

exception. First, she must "identify a fundamental and well defined policy in [her]

complaint sufficient to trigger the exception to the employment-at-will doctrine." *Id.* at ¶ 37,

237 Wis. 2d at 41, 614 N.W.2d at 453. Second, she must "demonstrate that the discharge

violated that fundamental and well-defined public policy." *Id.* If she can satisfy the first two

steps, the burden shifts to her employer "to show that the discharge was actually sparked by

just cause." *Id.* at ¶ 37, 237 Wis. 2d at 41-42, 614 N.W.2d at 454.

The plaintiff must also establish that she was discharged, either actually or constructively. Here, Slottke alleges that she was constructively discharged. To show constructive discharge, Slottke "must establish conditions so intolerable that . . . she felt compelled to resign." *Id.* at ¶ 75, 237 Wis. 2d at 62-63, 614 N.W.2d at 464. Further, the inquiry is an objective one, and the question is therefore whether a reasonable person in Slottke's situation would have felt forced to resign. *Id.* at ¶ 76, 237 Wis. 2d at 63, 614 N.W.2d at 464. An objective inquiry recognizes "that employees cannot be overly sensitive to a working environment" *Id.* Indeed, "the situation must be unusually aggravating and surpass '[s]ingle, trivial, or isolated' incidents of misconduct." *Id.* at ¶ 76, 237 Wis. 2d at 64, 614 N.W.2d at 464. At times, "[c]riminal activity . . . leads to intolerable conditions," though "[t]he mere presence of illegal conduct at the workplace does not render the environment intolerable." However, "intolerable conditions can arise . . . when the employer requests or requires an employee to engage in illegal acts." *Id.* at ¶ 77, 237 Wis. 2d at 64, 614 N.W.2d at 464. Furthermore, an employee must "show that the employer knew or should have known about the intolerable conditions but permitted them to persist without remedy." *Id.* at ¶ 74, 237 Wis. 2d at 62, 614 N.W.2d at 463.

In determining whether an employee was reasonable in feeling forced to resign, "trial courts turn to the totality of the circumstances, taking into account the frequency of the conduct, its severity, and the remoteness of the illegal acts from the actual date of resignation." *Id.* at ¶ 77, 237 Wis. 2d at 64, 614 N.W.2d at 465. Typically, therefore, whether an employee was constructively discharged "ultimately presents a question of fact for the jury." *Id.* at ¶ 78, 237 Wis. 2d at 65, 614 N.W.2d at 465. Judgment is appropriate,

however, where "it is . . . 'quite clear that under no conditions can the plaintiff recover.'" *Id.* (internal citation omitted).

*Application to This Case*

The present case poses three related questions. First, has Slottke identified a well-defined public policy sufficient to trigger the public policy exception to the at-will doctrine? Second, if so, has she shown that her discharge violated that public policy? And third, if the two questions are answered in the affirmative, has Slottke shown that she was constructively discharged?

*1.     Well Defined Public Policy*

In her complaint, Slottke identifies, among other statutes, Wis. Stat. § 943.39(1), which makes a Class H felony:

> [w]hoever, with intent to injury or defraud . . . (1) Being a director, officer, manager, agent, or employee of any corporation or limited liability company falsifies any record, account or other document belonging to that corporation or limited liability company by alteration, false entry or omission, or makes, circulates or publishes any written statement regarding the corporation of limited liability company which he or she knows is false.

The parties agree that Slottke has idenitifed a well-defined public policy of the State of Wisconsin for purposes of satisfying the first prong of the *Strozinsky* test. In *Strozinsky*, the Wisconsin Supreme Court determined that Wis. Stat. § 943.39 evinces a public policy sufficient to satisfy the requirement that a plaintiff identify a well-defined public policy. Therefore, Slottke has satisfied the first prong.

2. *Violation of Public Policy*

Having satisfied the first prong, Slottke must show that her discharge violated the public policy that she identified. Talgo argues, at most, that the evidence shows that it violated internal policy, which, it argues, would not violate the statute or public policy. I agree with Talgo that the narrow public policy concerns violations of constitutional or statutory provisions, not just mere failure to follow internal policies. However, it also may be true that the violations of internal policy did, in fact, violate public policy. For example, a violation of internal policy that results in falsifying records or circulating false written statements. I also agree that here a violation of public policy and a violation of the letter of the statute are one in the same. However, whether Talgo violated public policy is not just a question of whether Talgo violated the letter of Wis. Stat. § 943.39 but also the spirit of Wis. Stat. § 943.39. *Wandry v. Bull's Eye Credit*, 129 Wis. 2d 37, 384 N.W.2d 325 (Wis. 1986) (extending the rule of *Brockmeyer* to include the spirit, as well as the clear language, of a statutory provision).

Here, Slottke argues that safety, recordkeeping, and contract compliance are public policies underlying the law. Whether these public policies were violated remains in contention. At least three categories of material facts relevant to whether the alleged violations were mere internal policies, violations of internal policies that rise to the level of violating public policy, or violations of public policy are in dispute. Particularly, for example, the facts regarding the tracking of parts outside of SAP remain in dispute. While Talgo cites to Young's deposition, in which he testified that the use of the spreadsheet was not meant to conceal anything from auditors and that the parts were stored on the shop floor and shown to auditors (DPFOF at ¶ 72 (citing Hart Dep., Docket # 28-2 at 41:10-25)),

Slottke testified that she understood that these parts were tracked in a separate spreadsheet because the parts were nonconforming due to the train car shells having incorrect dimensions (Pl.'s Response to DPFOF, Docket # 32 at ¶ 72 (citing PPFOF at ¶¶ 51-54).) Young testified that the spreadsheet was located on a common drive and password protected. (DPFOF at ¶ 71 (citing Young Dep., Docket # 28-2 at 31:25-32:9).) Slottke cites to Attorney's McLeod's affidavit, in which he avers that neither he nor his client had access to the information until it was obtained from someone in Spain. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 71.) A conclusive finding of whether the tracking parts outside of SAP was done to avoid auditors or conceal parts that did not conform to the blueprints informs the determination of whether a violation of internal policy rises to the level of violating the public policy underlying Section 943.39. It is one thing to track parts in a way that does not conform to internal procedure for the sake of easiness; it is another to do so to hide information from state auditors.

Second, the parties are in dispute regarding NCRs for the parts from Spain. It is Slottke's position that there were no exceptions to issuing NCRs when nonconforming parts came in from Spain, citing to her deposition and complaint, as well as testimony from Hart's deposition, where he said that it would surprise him if Morcillo instructed Slottke to not issue NCRs in the case of nonconforming parts. (PPFOF at ¶ 43 (citing Hart Dep., Docket # 34-6 at 36:10-21).) Slottke averred that all parts and materials arriving at Talgo, even those with FAI forms, were not exempt from SAP tracking and Talgo's inspection and NCR procedures. (PPFOF at ¶ 31 (citing to Slottke Aff., Docket # 34-1 at ¶ 11).) Talgo cites to another portion of Hart's deposition, where he testified that there are "many, many items that come in that, for whatever reason, do not require inspection or some type of certificate

28

or whatever may be . . . ." (Def.'s Response to PPFOF, Docket # 38 at ¶ 31; Hart Dep., Docket # 34-6 at 21:18-21.) However, Slottke also cites to Lupo's deposition testimony for the proposition that Lupo issued some reports and found bad Spanish parts despite Morcillo's instruction not to do so, establishing that there were non-conformances that had not been identified, tracked, and corrected in Spain. (Pl.'s Response to DPFOF, Docket # 32 at ¶ 49 (citing to Lupo Dep., Docket # 34-8 at 17-18).) A conclusive determination about whether the black market/free issue parts had been and/or needed to be inspected is also necessary before I can determine if the violation of internal policy rises to the level of violating public policy. For example, failing to inspect parts and then saying that they were inspected could pose a risk to public safety, a public policy evinced in Section 943.39.

Third, the parties dispute facts regarding the NCR/MIR forms. For example, Slottke testified that she asked Lupo and Bembenek about certain forms they were creating because the forms were not part of the ISO system. (PPFOF at ¶ 37.) Slottke further testified that she asked Bembenek how he knew what gauge and what results to enter on the MIR forms, and he answered that he did not know and just completed the forms as he was told to do. (PPFOF at ¶ 38.) Further, at her deposition, Slottke testified that the forms were signed, backdated, and included information that they did not know to be accurate. (DPFOF at ¶ 85.) As with the previous two category of facts, I cannot determine the nature of what occurred with the MIR/NCR forms. It is perfectly acceptable for Talgo to have employees copy information from one form to another for purposes of complying with ISO. However, if employees were indeed instructed to falsify information to, for example, hide from auditors certain inspection results, it is possible that the instruction to falsify the forms resulted in a violation of public policy.

In sum, various categories of material facts remain in dispute that prevent me from determining whether the alleged violations rise to the level of undermining the public policy that is evinced in Wis. Stat. § 943.39. Without being able to make this determination, I cannot determine whether or not Slottke's discharge violated the public policy she has identified. Accordingly, summary judgment is not appropriate.

Next, I agree with Talgo that to prevail, Slottke must show that she, not her coworkers, was asked or required to participate in the alleged fraud. *See Bushko v. Miller Brewing Co.*, 134 Wis. 2d 134, 140-41, 396 N.W.2d 167, 169-70 (Wis. 1986). Slottke argues that she was implicitly required to participate in fraudulent activity because she was required to sign off on the dossier that would contain a compilation of fraudulent documents prepared by her coworkers. Thus, whether Slottke was required to participate in fraud turns on whether the component reports were fraudulent. Though Talgo points out the dossier was not completed, it is immaterial that the contract was later cancelled as the relevant inquiry is what Slottke was required to do at the time she resigned. That Slottke was required to prepare the dossier is not in dispute. (*See* Def.'s Response to PPFOF, Docket # 38 at ¶ 71; Wisconsin Contract Sec. 42.01.6, Docket # 31-1 at 38.) However, on the underlying facts, the parties are in dispute. While Talgo submits that the documents were backdated only to transfer information to the correct form, Slottke says that information entered on the forms was made up. And though Talgo's positions is that it did not need to do inspections of the black market/free issue parts from Spain, Slottke's position is that there were no exceptions to the inspection and NCR procedure. Similarly, she states that there was no exceptions to parts being tracked in SAP. The dispute of material facts

necessary to decide whether Slottke was required to participate in the alleged fraud makes summary judgment inappropriate.

### 3. *Constructive Discharge*

Ultimately, even if Slottke could meet the burden of the public policy exception, she must show that she was constructively discharged. That is, she must show that "intolerable conditions" led to her resignation. The facts necessary to make such a finding are so intertwined with the facts necessary to make the findings discussed above—whether Talgo acted in violation of public policy and whether Slottke was asked to participate in a fraudulent scheme—and would factor into a determination of whether conditions were intolerable.

Furthermore, the parties dispute facts concerning another consideration in constructive discharge: whether Talgo "knew or should have known about the intolerable conditions but permitted them to persist without remedy." *Strozinksy*, 2000 WI 97, ¶ 74, 237 Wis. 2d at 62, 614 N.W.2d at 463. The parties also dispute the nature and timing of Slottke's complaints to management about her suspicions that Talgo was engaging in fraud. Therefore, there are not conclusive facts regarding what Talgo knew or should have known about the alleged fraud. Therefore, I cannot determine that Talgo had an opportunity to correct the alleged fraud, if it did indeed occur.

## CONCLUSION

"Courts should proceed cautiously when making public policy determinations." *Brockmeyer*, 113 Wis. 2d at 573, 335 N.W.2d at 840. In this case, the parties dispute numerous material facts that preclude summary judgment. Without conclusive findings of fact, particularly regarding the alleged noncompliances with the safety standards, I cannot

determine whether the defendants are entitled to judgment as a matter of law. Therefore, the defendant's motion for summary judgment is denied.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's Motion for Summary Judgment (Docket # 25) is **DENIED**.

Dated at Milwaukee, Wisconsin this 6th day of May, 2014.

BY THE COURT:

_s/Nancy Joseph_

NANCY JOSEPH
United States Magistrate Judge